IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Action No. 5:21-cr-00012 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| JENNIFER RAE MCDONALD | ) | United States District Judge |

**MEMORANDUM OPINION AND ORDER**

This matter is scheduled for a six-week trial to begin on August 21, 2023, in the

Harrisonburg Division.  The defendant, Jennifer Rae McDonald, is charged with numerous

counts of wire fraud, bank fraud, and money laundering, in addition to a charge of aggravated

identity theft, committed while she was the Executive Director of the Economic Development

Authority (EDA) for the Town of Front Royal and Warren County, Virginia, from April 2008

until December 2018.  Before the court are a number of motions in limine.  (*See* Dkt. Nos. 95–

102, 104–05.)  Also before the court is defendant's objection to the government's notice of intent

to use certified business records.  (Dkt. No. 103.)  Additionally, defendant has made an oral

motion renewing her motion for change of venue.

The court heard argument on these motions at the final pretrial conference on August 11,

2023.  For the reason set forth on the record at the conference and for the further reasons set forth

below, the court resolves these motions as follows.

**I.  Government's Motion to Admit Evidence of Defendant's Prior Statements (Dkt. No. 95)**

In this motion, the government seeks to admit a single document, a purported board

resolution defendant introduced as an exhibit in a state civil proceeding.  (Ex. A, Dkt. No. 95-1.)

The government argues that the document is relevant to several charges in the indictment,

specifically as to counts 1 (wire fraud) and 11 (bank fraud), which are associated with the

purchase of properties on Buck Mountain, as well as other counts arising from the sale of those properties, including identity theft and money laundering (counts 18–21).  The document purports to reflect EDA board authorization for the defendant's conduct underlying these counts. The government anticipates that multiple witnesses will testify that defendant was not authorized by the EDA to purchase the property, nor was the purchase connected to any legitimate authorized EDA business.

The government argues that the statements in the document are not hearsay because they are party admissions.  Fed. R. Evid. 801(d)(2)(A) (providing that a statement is not hearsay when it is "offered against an opposing party" and "was made by the party in an individual or representative capacity").  The Federal Rules of Evidence define "statement" to include oral and written assertions.  Fed. R. Evid. 801(a).  For support, the government cites to *United States v. Gordon*, 754 F. App'x 171, 177 (4th Cir. 2018), in which the Fourth Circuit affirmed the admission of a defendant's filing from a prior bankruptcy proceeding, finding it was a party admission.

The government also argues that the statements are not hearsay because they were offered into evidence in the state civil proceeding through McDonald's attorney.  *See* Fed. R. Evid. 801(d)(2)(C) (providing that a statement is not hearsay when it is "offered against an opposing party" and "was made by a person whom the party authorized to make a statement on the subject"), (D) (providing that a statement is not hearsay when it is "offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed").  "Generally, statements by an attorney concerning a matter within his employment may be admissible against the retaining client."  *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986); *see also Gordon*, 754 F. App'x at 177 ("[F]actual

admissions made by Gordon through his bankruptcy lawyer . . . are admissible non-hearsay because they were made by Gordon's attorney, acting as his agent, during and within the scope of the principal-agent relationship.") (citing Fed. R. Evid. 801(d)(2)(D)).

Defendant argues that *Gordon* (and other cases cited by the government) are distinguishable because the statements came from bankruptcy petitions, or their related proceedings, which are initiated by the defendants themselves.  In this case, the government is seeking to introduce a document used in a civil proceeding brought against the defendant.  The document was used by defendant's counsel to question adverse witnesses in an evidentiary hearing, a hearing at which defendant was not even present.  Defendant also emphasizes that the document was not signed by her nor was it included in any pleading signed by defendant.  Defendant also argues that *Gordon* is distinguishable because there, the allegedly falsified document was noticed under Rule 404(b), 754 F. App'x at 176.  Here, by contrast, the government did not provide notice of its intent to introduce the purported board resolution.

Defendant also argues that the document is not relevant to any issue in the case.  The government posits that the purported resolution allows her to purchase property that is directly at issue in this case.

Taking the issue of relevancy first, the court finds that the document is relevant.  It is a purportedly manufactured board resolution and it pertains to the purchase of a property—the Buck Mountain property—that is directly related to some of the counts in this case.  So, it is clearly relevant.  It is also relevant evidence for consciousness of guilt.  *See United States v. McDougald*, 650 F.2d 532, 533 (4th Cir. 1981); *United States v. Straccialini*, 489 F. App'x 663, 665–66 (4th Cir. 2012).

Regarding the argument that the document is not a statement by McDonald, the court

notes that attorney statements on behalf of a defendant are non-hearsay. *Gordon* is instructive on this point. There, the court held that where defendant had introduced a purported bridge loan agreement in his bankruptcy—a document demonstrated to be manufactured and backdated—the document was admissible against the client. The court also noted that in responding to assertions of the trustee, Gordon's lawyer included facts after consulting with persons other than his client, and some items that did "not involve matters within Gordon's direct knowledge." 754 F. App'x at 178. Nonetheless, because those responses were made by the lawyer during the attorney-client relationship regarding matters within the scope of that relationship, the statements were not hearsay under Rule 801(d)(2)(D). *Id.*

Defendant argues, though, that there was no statement made by the attorney, because the attorney was simply asking questions about a document. According to defendant, those questions do not involve a "clear and unambiguous admission of fact" that can be binding on a party. *Blood*, 806 F.2d at 1221. Defendant also emphasizes that there is no evidence that the document was created by McDonald. Based on these facts, defendant contends the document cannot be considered a "statement" by her.

The court disagrees. First of all, Gordon makes clear that even if a lawyer's statement is made on behalf of his client without direct knowledge by his client, it can be a statement attributed to the client. *Gordon*, 754 F. App'x at 178. Moreover, the court has reviewed the transcript of the hearing at which the document was discussed. The document itself may not have been *created* by McDonald, and her counsel stated that he did not want to "over represent" where the document came from. In particular, he explained that it was "in a collection of documents that [he] received," but he did not "know that they all came from one source." (Tr. 195–96, Dkt. No. 95-2, at 8–9.) Later, though, when the court paraphrased counsel's earlier

answer as being that counsel got the document from client, but did not know where his client got them.  Counsel responded that the court's statement was "essentially right."  He followed up: "They were given to me – I mean, kept in her possession.  I don't know – I got a collection of documents from her.  And it was part of that, so . . . ."  (*Id.* at 204, Dkt. No. 95-2, at 16.) Additionally, text messages presented by the government at the pretrial conference show that ten days before that hearing, McDonald sent a copy of that document to her sister saying, "Look what I found!"  So, all available evidence suggests that the document was at least given to her counsel by McDonald, if not created by her.  This supports allowing it to be attributed to her.

Defendant also is correct that counsel did not make an express statement at the hearing that the document was a valid board resolution.  But McDonald's counsel moved for the admission of that document, which the court granted over objection.  He also used the document to question witnesses.  In doing so, he attempted to elicit testimony that the directions in the document were "consistent" with an explanation either given by McDonald or found on her computer where the rights to purchase the properties at issue were being assigned to McDonald's LLC, "DaBoyz, LLC."  (Tr. 192–193, Dkt. No. 95-2, at 5–6.)  In doing so, he effectively offered the document as a valid document.

For all of the reasons above, the court concludes that the document is not hearsay. Instead, it is admissible as an authorized statement by defendant's own attorney pursuant to Rule 801(d)(2)(C) and (D).  The court GRANTS the government's motion to admit this document.

## II.  Defendant's Motion to Exclude Testimony of Cherry Bekaert Regarding Information it Gleaned, and Opinions it Formed, During an EDA Audit and Any Exhibits Resulting From Any Draft or Report of Such Audit (Dkt. No. 96)

Defendant moves to exclude testimony of witnesses from the auditing firm Cherry Bekaert as to any information gleaned, and any conclusions or opinion formed, based on their

audit of the EDA, and to exclude introduction of any and all portions of the Cherry Bekaert draft report. This includes the testimony of Scott McKay, who has been noticed as a government witness and was employed by Cherry Bekaert.

Warren County engaged the services of Cherry Bekaert to conduct an internal review of the EDA's finances. In 2018, McKay was a partner at Cherry Bekaert. McKay has a Bachelor of Science degree in business administration and a master's degree in accounting. McKay is also a Certified Public Accountant, Certified Fraud Examiner, and a Certified Internal Auditor. McKay led the review by managing a team of auditors and investigators. The team collected documents maintained by the EDA. The team interviewed defendant extensively, at least on ten occasions. The team also interviewed several EDA Board Members and employees. McKay participated in many of the interviews personally. The interviews were recorded, and McKay listened to the interviews. McKay and his team drafted a report titled "Working Papers of Internal Review and Fraud Examination."

Defendant argues that the testimony of these witnesses would not be based on their personal knowledge. Fed. R. Evid. 602. Also, the testimony would be based on scientific, technical, or other specialized knowledge within the scope of Rule 702, and these witnesses have not been noticed as experts.

The government argues that McKay has personal knowledge to testify because of his involvement in the investigation. McKay's personal knowledge comes from obtaining and reviewing documents, as well as interviewing those involved in the operation of the EDA, particularly defendant. The government insists that an investigator involved in an investigation can testify as to steps they took and the findings of the investigation. *See United States v. McCorvey*, 215 F. App's 829, 834 (11th Cir. 2007). Further, supervisory law enforcement agents

6

can testify about aspects of an investigation they did not personally observe when the court finds that their "supervisory involvement provided an appropriate level of personal knowledge." *United States v. Christie*, 624 F.3d 558, 568 (3d Cir. 2010).  The government further explains that it did not notice McKay as an expert because he will be offering lay opinion testimony that is based on his perceptions, helpful to understanding his testimony or to determine a fact in issue, and is not based on scientific, technical, or other specialized knowledge.  Fed. R. Evid. 701.

As part of this motion in limine, defendant also objects to specific proposed exhibits— Ex. 7, 8, and 11, among others.  Exhibit 7 is a text message conversation extracted by Cherry Bekaert of a conversation between defendant and Warren County administrator Doug Stanley. Exhibit 8 is a summary that describes the financial condition of the EDA.  The government expects McKay to testify that they examined financial statements and other bank records maintained by the EDA, information that is contained in Exhibit 8.  Like Exhibit 8, Exhibit 11 summarizes documents and findings of Cherry Bekaert's internal review of the EDA and its finances.  Exhibit 11 shows defendant's salary, bonuses, and benefits, as well as property she stated she owned.  It is based on documents collected by Cherry Bekaert, as well as defendant's own statements and disclosures about property she owned.

As explained at the pretrial conference, the court DENIES WITHOUT PREJUDICE the motion to exclude testimony of Cherry Bekaert related to the audit.  The motion seeks to exclude a large amount of information and documents, and it is difficult for the court to evaluate them outside the context of the evidence being offered at trial.  The court notes that the government says they are not calling McKay as an expert witness, and they will not be permitted to offer expert testimony through him.  As for whether or not he will be permitted to offer lay witness opinion or testify about certain documents, that will depend on the particular question asked.

Counsel is welcome to make appropriate objections at trial with regard to all of these matters.

### III. Defendant's Motion to Preclude Reference to the Suicide of Daniel McEathron and Any Reference to or Introduction of a Purported Suicide Note (Dkt. No. 97)

Defendant moves to preclude reference to the suicide of Daniel McEathron, the Sheriff of Warren County from 2003 to 2019, and to a letter that McEathron addressed to the FBI and left with other notes before killing himself. The indictment alleges that McEathron and defendant owned and operated DaBoyz, LLC, as part of the fraudulent scheme.

The court hereby GRANTS in part and DENIES in part this motion, essentially by agreement. The parties agree that the fact that Mr. McEathron is deceased is admissible, and important in presenting a reason to jurors as to why he is not present to testify. With regard to the date of his death and whether that is admissible, counsel for both parties stated that they believed they would be able to agree to some language for a stipulation.

The government agreed, however, that it will not refer to McEathron's suicide or his suicide note during its case-in-chief. If the government believes that either the fact of the suicide or the suicide note becomes appropriate impeachment evidence, it will first advise the court before utilizing that evidence or making any statements in front of the jury about either.

### IV. Defendant's Motion to Exclude Testimony of Kristi Atwood and/or Exhibits Regarding Any Anonymously Received Documents that Cannot be Independently Authenticated (Dkt. No. 98)

Defendant moves to exclude testimony from Kristi Atwood regarding any anonymously received documents, and to exclude introduction of any and all portions of anonymously received documents regarding any anonymously received documents that cannot be independently authenticated. Atwood is a citizen of Warren County who started a Facebook page in 2018 named "One Mad Mother" to expose Warren County's interactions with her regarding her house that had burned down. In 2019, Atwood began receiving anonymous calls

8

advising her to pick up documents at various locations.  Atwood picked up the documents and then posted a number of the documents on her Facebook page.

This motion is GRANTED BY AGREEMENT, as the government does not intend to call Atwood as a witness or attempt to introduce exhibits obtained by Atwood unless McDonald's counsel opens the door to that testimony.  If the government believes that the door has been opened and that any of these exhibits or Atwood's testimony would be appropriate impeachment evidence, it will first advise the court before utilizing that evidence.

## V.  Government's Motion to Preclude Certain Cross-Examination (Dkt. No. 99)

The government represents that it has reason to believe defendant will improperly attempt to ask questions on cross-examination that are irrelevant, lack a reasonable factual basis, or would confuse the jury and prejudice the government's witnesses.  They point, in particular, to a number of questions asked during the June 21, 2023 deposition of William M. Biggs by counsel for defendant.  Defendant's counsel agreed that it could not ask questions of a witness that lacked a factual basis or are overly prejudicial.  Thus, the motion is GRANTED by agreement. Should a question be asked that the government believes is irrelevant or lacks any factual basis, it may object at trial.  The court obviously expects its rulings during the course of trial to be followed, and has every expectation that all counsel in this case will do so.

## VI.  Government's Motion to Prohibit Cross-Examination Concerning Related Civil Cases or Arrests (Dkt. No. 100)

As discussed at the pretrial conference, the government sought to exclude evidence about civil cases in which some witnesses were defendants or possible defendants.  For example, the EDA brought several lawsuits against defendant and others for conduct related to her tenure at the EDA, obtaining jury verdicts against some individuals and settling claims against others. Still others have not yet been resolved.  Additionally, criminal charges were brought against

9

some of the witnesses, although most of those charges were nolle prossed and one set of

charges—for "misfeasance"—were nolle prossed and then expunged.  The government contends

that McDonald should not be able to use any of this evidence in order to cross-examine

witnesses.   It argues that the questioning could confuse the jury, mislead the jury, and waste

time, and also argues that these prior cases are irrelevant.

In response, McDonald emphasizes her right to cross-examine witnesses.  She notes that

the bias of a witness "is always relevant as discrediting the witness and affecting the weight of

his testimony." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  According to defendant, these

witnesses would testify that their involvement with these cases has been difficult, troubling,

perhaps highly traumatic, and financially ruinous.  Thus, there are clear reasons why all of these

individuals might feel personal animus toward defendant and might wish to ensure that they are

seen as exonerated by this process, as well as put as much distance as possible between

themselves and the crimes alleged in this matter.  Prohibiting "a criminal defendant from cross-

examining a witness on relevant evidence of bias and motive may violate the Confrontation

Clause, if the jury is precluded from hearing evidence from which it could appropriately draw

adverse inferences on the witness's credibility." *United States v. Turner*, 198 F.3d 425, 429 (4th

Cir. 1999).

The court agrees with defendant and must reject the government's request for a sweeping

prohibition on matters for cross-examination.  Rule 608(b) does not prohibit cross-examination

into bias. *See United States v. Gearheart*, Criminal Action No. 7:23-cr-00013, 2023 WL

3808112, at *3 (W.D. Va. June 5, 2023) ("Applying [Rule 608(b)], the Fourth Circuit has long

recognized the authority of a district court, in its discretion, to permit counsel to cross-examine

witnesses about specific instances of conduct that are 'probative of truthfulness or

untruthfulness.'") (quoting *United States v. Leake*, 642 F.2d 715, 718 (4th Cir. 1981)).  Inquiry into bias is separate from character evidence.  *See id.* at *3–4 (discussing bias separate from character for truthfulness because the "constitutional right of confrontation, courts have long held, necessarily includes the right to cross examine witnesses for potential bias").  Therefore, the court DENIES the government's motion.

## VII.  Defendant's Motion to Exclude Testimony of Expert Thomas I. Kelsey (Dkt. No. 101)

In this motion, defendant stated that the government intends to offer Kelsey as an expert in commercial and residential real estate and to have him testify about "standard practice in these transactions, including standard roles of individuals and documents involved in these transactions."  (Dkt. No. 62.)  Among other arguments, defendant believed the notice did not provide sufficient details about what Kelsey's opinions would be.  In its response, the government explained that it did not notice any opinions related to the specific details of this case because Kelsey will not offer any opinions about the details of this case.

At the hearing, defendant's counsel acknowledged that the government's response helped counsel understand better the purposes for which Mr. Kelsey is being offered.  The parties essentially agreed that Kelsey need not be excluded ahead of trial, but that defendant would be given sufficient opportunity to conduct a voir dire of him about some of his expertise and, in particular, about his knowledge and familiarity of real estate transactions in the specific geographic region where the relevant events occurred.

Accordingly, the court DENIES defendant's motion to exclude testimony by Thomas Kelsey at this time.  Defense counsel will be able to voir dire the witness with regard to his background and expertise before he is allowed to testify as an expert.

11

## VIII.  Defendant's Motion to Exclude Testimony of EDA Personnel Hired After Defendant's Departure (Dkt. No. 102)

McDonald had moved to exclude the testimony of Doug Parsons and Carolyn Stimmel, both of whom worked at EDA, but after her departure.  Although they were on the government's witness list, the government no longer intends to call either witness in its case-in-chief.  In the event defendant presents evidence that prompts the need to call these witnesses, the government states that it will alert defendant and the court and request an opportunity to fully address this motion.  Based on this representation, this motion is DENIED AS MOOT.

## IX.  Defendant's Objection to Notice of Intent to Use Certified Business Records (Dkt. No. 103)

In this filing, defendant objected to seven different sets of records.  As to many of these, the government has responded that it no longer intends to introduce the records at trial.  Thus, most of the matters are mooted by agreement.  Defendant's objection to the introduction of EDA emails remains.

Defendant first disputes that the EDA emails produced by EDA employee Gretchen Henderson are self-authenticating under Federal Rule of Evidence 902(11).  She makes two arguments in this regard.  First, she argues that Henderson is not a "qualified witness," Fed. R. Evid. 803(6)(D), because she was no longer employed by the EDA when she completed her certificate, although it is undisputed that the documents were produced while Henderson was still an employee.  As part of this same argument, defendant notes that Henderson was not even employed by the EDA at the time the documents were created, and that she was not familiar with how those documents were kept prior to those changes.  Second, defendant argues that the emails do not qualify as a business record under Rule 803(6).  In particular, defendant contends that emails bear no indicia of accuracy and are not the type of information on which a business relies

to operate.

Although the parties' briefing (and their argument at the hearing) focused primarily on whether Henderson's Rule 902(11) certification is valid, both Henderson and Nathan Scott authenticated the emails as certified records generated by an electronic process or system under Federal Rule of Evidence 902(13).  (Dkt. No. 61-2 at 63.)  Scott is the Chief Technology Officer for Queen Consulting and Technologies, the company that serviced the EDA's information and technology needs, including the maintenance of their email system.  (*See* Ex. A, Dkt. No. 116-1.)  Defendant objects to Scott's certification as untimely, but on no other grounds, and the government has requested that it be accepted late.  Having reviewed the arguments of the parties, the court will accept the late certification from Scott and allow that to authenticate the records.  This is a matter of efficiency for purposes of trial, and the court sees no purpose in to requiring Scott to come testify about the recovery of these documents, especially in the absence of other objections to his qualification or the certification.  Thus, defendant's objection to the authentication of the EDA emails fails.  Of course, as the government acknowledged, it still will need to establish relevance and any hearsay statements within the emails fall within an exception to the bar on hearsay.

For the foregoing reasons, this motion is DENIED.

## X.  Motion to Exclude Evidence Regarding Gambling (Dkt. No. 104)

Defendant next moves the court to exclude records and testimony regarding defendant's gambling.  The government's exhibit list includes records from Hollywood Casino in Charlestown, West Virginia, and its witness list includes the director of compliance and risk there, Laura Gatto.  It is likely that other witnesses, such as Roger Bianchini of the Royal Examiner, will also testify about defendant's gambling.  It appears that the government plans to

use this evidence to show that defendant lost large sums of money gambling.

Defendant argues that this evidence is subject to Rule 404(b) and is not intrinsic to the offenses charged, and complains that the government has not filed a notice of intent to use this evidence as the court's scheduling order and Rule 404(b) require. Also, defendant argues that the Hollywood Casino records are complicated and not fairly intelligible by a lay audience. They are both over- and under-inclusive, and in addition do not integrate the "house money" the casino gave McDonald to gamble with, and thus ultimately do not show whether and to what degree the losses alleged were hers. Finally, defendant contends that Gatto's anticipated testimony qualifies as expert testimony, for which she has not been noticed as an expert.

As the court stated on the record, this motion is DENIED. Federal Rule of Evidence 404(b) is "only applicable when the challenged evidence is extrinsic, that is, separate from or unrelated to the charged offense." *United States v. Bush*, 944 F.3d 189, 195 (4th Cir. 2019). In contrast, acts that are part of, or "intrinsic to, the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *Id.* at 195–96. And the court agrees that the evidence of McDonald's gambling is intrinsic to her crimes. It would be evidence of the defendant spending fraudulently gained proceeds, and it shows how she spent at least a portion of the money she allegedly stole. Additionally, according to the government, the money spent at the casinos is directly attributable to the funds she stole from the EDA. The government states that evidence will show that defendant stole EDA money and then laundered it through DaBoyz LLC, which then transferred approximately $500,000 to credit cards controlled by defendant. Additionally, the government believes the evidence will show defendant stole over $800,000 from the EDA by diverting EDA funds directly to those same credit cards. She then used these credit cards to fund over $1.6 million in cash withdrawals at the Hollywood Casino. "Evidence of uncharged

14

conduct is not considered other crimes evidence if it arose out of the same . . . series of transactions as the charged offense, . . . or if it is necessary to complete the story of the crime (on) trial." *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994).  The intrinsic nature of this evidence, therefore, makes it unnecessary for the court to determine whether the evidence also can be offered to show that her statement about her gambling winnings was a false exculpatory statement, and so the court does not address that issue.[1]

Further, evidence of legal gambling activity is not unduly prejudicial.  *See United States v. Barker*, 181 F.3d 91 (4th Cir. 1991) (upholding admission of defendant's gambling where evidence showed motive and was not unduly prejudicial).  Courts have cautioned against appeals to class prejudice, but have nonetheless found the admission of gambling evidence to be proper. *See United States v. Jackson-Randolph*, 282 F.3d 369, 377 (6th Cir. 2002) (noting the fact-specific nature of an analysis regarding improper appeals to class prejudice and compiling numerous court decisions finding evidence of extravagant spending admissible).

Lastly, the court will not exclude the witness Laura Gatto prior to trial.  If defense counsel believes any of her testimony calls for an expert opinion versus a lay opinion, counsel may object at trial.  With regard to whether the documents are over or under inclusive and whether they are understandable, those are issues that can be addressed on cross-examination.

---

[1] "Juries may . . . consider false exculpatory statements as evidence of a defendant's 'consciousness of guilt,' meaning the defendant knew he was doing something wrong or illegal, which bears on the issue of knowledge." *United States v. Ath*, 951 F.3d 179, 187 (4th Cir. 2020).  Because false exculpatory statements are admissible, the government can establish the falsity of such statements through information presented at trial. *United States v. Marfo*, 572 F. App'x 215, 230–32 (4th Cir. 2014) (jury may consider defendant's false exculpatory statements where the government proved those statements false through evidence at trial).  Thus, the government argues it can introduce evidence of her losses at the casino to show that her story of gambling winnings—which she offered as a reason for her unexplained wealth (as opposed to theft from the EDA)—is false.  For her part, defendant argues that false exculpatory statements are only admissible when they are made in the context of the defendant being accused of a crime or during the course of an active law enforcement investigation.  Because she did not make her statements about gambling winnings in that context, she argues they cannot be admitted on that ground.

For these reasons, the court DENIES defendant's motion to exclude evidence of her gambling activities.

## XI.  Defendant's Motion to Exclude Testimony of Expert Rachel Clay Related to March 9, 2022 Laboratory Report (Dkt. No. 105)

The government intends to call as a witness Rachel A. Clay, a Federal Bureau of Investigation (FBI) document examiner, and to have her testify about her analysis and comparison of certain documents.

As part of the FBI's investigation, Clay reviewed 24 individual documents, each designated by unique item numbers.  Clay was asked to examine and compare 44 handwritten markings (including signatures and initials) within and between those documents.  Certain of the documents were believed to be forged by defendant in furtherance of the fraudulent scheme set forth in the indictment and her attempts to cover-up the indicted theft.  Clay opined that the signatures of the documents investigators believed to be forged shared a common source at some point in time with signatures from the true and accurate documents.  The government intends to show that the documents used by defendant in furtherance of her scheme and examined by Clay were falsified.

At the pretrial conference, the parties agreed that part of the motion was moot, in part because the government agreed not to introduce some of those documents.  Four items of dispute remain, though: Items 1 through 4, which are properly grouped as Items 1 and 3, and Items 2 and 4.

### A.  Items 1 and 3

Items 1 and 3 were provided to the government by McDonald's prior counsel via email approximately two months after McDonald's proffer session, and he stated that they were being

"provided within the proffer agreement."[2]  The government then provided Items 1 and 3 to Clay.

She determined that the signatures on Items 1 and 3 share a common source with the signatures

on authentic EDA documents to which defendant had access.  Clay's report indicates that the

signatures on Items 1 and 3 were lifted from legitimate documents.  Pursuant to the

government's investigation, it intends to present several witnesses at trial whose cumulative

testimony will show that Items 1 and 3 are false.  Defendant argues that their introduction, as

well as the use of the documents to render any opinion, is prohibited by the proffer agreement

signed by McDonald, her counsel, and the government.

Defendant appeared for a proffer at the United States Attorney's Office in Charlottesville,

Virginia, on December 14, 2020.  The terms of the meeting were governed by a contract, a

proffer agreement between defendant and the United States.  (Ex. A, Dkt. No. 118-1.)  The

proffer agreement states: "This agreement applies to statements I make and information I provide

at an interview conducted on Monday, November 23, 2020,[3] at the U.S. Attorney's Office in

Charlottesville, Virginia."  (Ex. A at 1.)  The Agreement further stated that: "I understand that if

I give a false statement (during the interview and/or thereafter), . . . the Government may use any

statements I make and any information I provide for any purpose."  (*Id.*)

According to the government, during the December 14, 2020 proffer, defendant made

multiple false statements in breach of the agreement.  If true, any statements made during the

proffer or information provided by her pursuant to the proffer agreement could be offered at trial.

*See United States v. Seeright*, 978 F.2d 842, 844 (4th Cir. 1992) (affirming denial of motion to

---

[2]  The government contends that, because of the timing, Items 1 and 3 were not offered pursuant to the proffer agreement, which by its terms was limited to the single day of the proffer session.  In light of the court's conclusion that McDonald breached the proffer agreement, it needs not address that argument.

[3]  The proffer agreement is signed only by the defendant.  The government does not dispute that the proffer agreement was meant to apply to statements made at the December 14, 2020 interview.

suppress statements made during proffer session, where defendant materially breached the proffer agreement).  The government stated that it could prove such false statements and offered several examples.  The first one was supported only by a proffer of government's counsel that a number of witnesses would dispute that a certain document provided by McDonald was real and authentic.  Defendant's counsel countered that this was insufficient proof of a false statement— noting that it would depend on whether the factfinder believed McDonald (or her evidence), on the one hand, or the other witnesses, on the other hand.

In response, the government then asked to be able to provide a second example of a false statement made during the proffer.  After conducting some initial research and confirming with counsel that it was acceptable to proceed in this fashion, the court held a brief evidentiary hearing to determine whether McDonald breached her proffer agreement.[4]  In doing so, the court explained that the government must show, by a preponderance of the evidence, that there was a material breach.  The same approach has been utilized in similar contexts.  *See, e.g.*, *United States v. Gerant*, 995 F.2d 505 (4th Cir. 1993) (noting that the government bears the burden of showing by a preponderance of the evidence a breach of a non-prosecution agreement and, after holding an evidentiary hearing and finding such a breach, allowing the prosecution counts based on the false statements); *United States v. Bulger*, 816 F.3d 137, 148 (1st Cir. 2016) (explaining that a district court properly considered the issue of immunity pursuant to an immunity agreement prior to trial because "immunity agreements are appropriate fodder for the court"); *United States v. Castaneda*, 162 F.3d 832, 835–36 (5th Cir. 1998) (requiring that the government prove a material breach of an oral transactional immunity agreement by a preponderance of the

---

[4]  The court allowed the parties until noon on August 15, 2023, to provide any authority or argument showing that this was not a proper procedure for the court to make this determination.  Neither party filed anything with the court by that deadline or any objection to the court's approach.

evidence before being allowed to prosecute the defendant).

At the evidentiary hearing, the government presented testimony, through both a witness and documents, on only one alleged breach.  Specifically, the hearing focused on two promissory notes and a loan agreement seized by the FBI during the execution of a federal search warrant at McDonald's former office.  These documents (Gov't Ex. 8, Dkt. No. 128) purport to reflect that Larry Tuttle loaned DaBoyz, LLC (an LLC created by McDonald and for which she is a majority owner) money to buy two properties.  During the December 2020 proffer session, McDonald was asked if she had created those documents, and she stated that she had not.  She also stated that she did not know who created them.

FBI Special Agent Hasty testified during the evidentiary hearing and described his investigation into these documents.  His investigation began by subpoenaing records from the entity—Law Depot—whose copyright notation was on some of the documents.  His testimony reflected that these forms were created by a user account on Law Depot, who entered the information into a template form.  The user account was created by Jennifer McDonald's Law Depot account, according to Hasty.

Hasty based this conclusion on several facts.  First, the account was created using email addresses associated with McDonald.  The account also was linked to one IP address associated with McDonald and another IP address that was associated with a close relative (either her husband, sister, half-sister, or brother-in-law, Hasty could not recall).  The transactions used to create the documents were linked to McDonald's Bank of America credit cards and her credit cards with Bank of America (as well as a credit card held by her husband on one transaction) reflected matching payments to the Law Depot account that was used to create the forms.  The number of payments from her credit cards was in "the teens."

Additionally, the Law Depot records show that fields in the document were last revised in October 2018, although the documents are dated March and April 2017. This suggests they were backdated. The backdating is further supported by information obtained from the other signatory to the agreements, Tuttle. Tuttle took pictures of the documents the date he signed them, which was on October 10, 2018, and a packing slip addressed to Tuttle was found in the EDA office with a date of October 2018 and with what appeared to be McDonald's signature on it. Agent Hasty also described a text exchange between McDonald and her mother in October 2018, when the mother sent McDonald Tuttle's address after saying that he was a "go."

Based on the evidence presented at the hearing, the court concludes that the government has shown—by a preponderance of the evidence—that Exhibit 8 consists of documents created by McDonald. Thus, McDonald made a false statement during the proffer session when she denied creating the documents or knowing who did.

Additionally, it is clear that the denial was material. The government maintains that the trial evidence will show that McDonald had several fraudulent schemes. Her biggest was that six times she stole EDA money and then purchased property in the name of different people or entities, including DaBoyz, LLC. Two of the properties are the two properties referenced in Exhibit 8, and—according to the government—it was EDA money that bought those properties. As such, documents that purport to show instead that another person loaned DaBoyz, LLC the money, if false, create the false impression that the money did not come from EDA. Denying that she created the documents was clearly material to the allegations in the indictment.

Defendant points out that she admitted in the proffer to having knowledge of the documents and admitting that she sent them at someone else's urging, once confronted with the shipping slip. Based on this, she contends that it is not a material false statement as to whether

20

or not she *created* the documents.  The court disagrees.  While the evidence presented to the court may not rule out that another person could have created these documents, it certainly makes it more likely than not that she did.  And if she had admitted creating the false document during the proffer—an after-the-fact document to explain the source of the monies she used to purchase properties—that would have been significant evidence of her guilt.  Thus, her denial was material.

Because the proffer agreement was breached by McDonald, the government is released from the prohibition in the proffer agreement on using the documents against her.  Thus, the motion to exclude Items 1 and 3 or testimony based on them is DENIED.

### B.    Items 2 and 4

Item 2 is a document supplied by Cherry Bekaert, the accounting company that conducted an audit of the EDA, with no reference to the original source of the document.  Item 4 is a document presented to a special state grand jury, with no reference to the original source of the document.  Because they cannot be authenticated, defendant argues that Clay's opinions do not have any probative value and must be excluded.

The government has stated, though, that it will call a witness who will testify as to the source and authenticity of both documents.  At the pretrial hearing, defendant simply asked the court to wait to make a decision as to these documents and see whether the government is able to authenticate them prior to allowing Ms. Clay to testify based on them.  Defendants agreed with this approach, and so that is the approach the court will take.  Thus, the motion is DENIED WITHOUT PREJUDICE as to Items 2 and 4, subject to proper authentication at trial.

As for defendant's objections to other aspects of Clay's testimony, defendant will have the opportunity to question the witness's qualifications and also will have the opportunity to

direct questions that go toward the weight of the evidence, rather than its admissibility.

## XII.    Renewed Motion for Change of Venue

At the pretrial conference, defendant renewed her motion for a change of venue, and the parties argued the same.  The court denied defendant's first motion for change of venue, but agreed to exclude from the jury pool residents of Warren County and the Town of Front Royal, the areas most likely to have been affected by press coverage of the relevant events.  (*See generally* Mem. Op. & Order, Dkt. No. 64.)  In renewing her motion, defendant renews her original arguments, and she also contends that the jury questionnaires from the first group of potential jurors summonsed show that it will be difficult to seat a jury that is untainted by news coverage and that the length of trial and distance jurors will have to travel is going to make it difficult to seat a jury.

The court took the motion under advisement and asked the parties to provide any additional information relevant to the motion concerning the jury venire's responses to the juror questionnaires.  Defendant has provided a list of jurors that she believes should be excused based solely on the questionnaires, 46 of them so far: 27 for cause, 18 for scheduling conflicts and/or transportation issues, and 1 juror placed in a category of "Other," who has indicated that a prior experience with a trial in which a family member was a murder victim will cause him to experience significant difficulties being in court.[5]

The court sent out 120 jury summonses with questionnaires in a first batch, and has received back more than 100 responses.  The court also decided to send out a second round of 60 summonses with questionnaires, and those jurors have been directed to appear on the second day

---

[5] The government has not filed anything with the court in response to this information.  Thus, the court does not know if the government agrees that some or all of those identified should be struck.

22

of trial.  The court did so in order to be able to utilize the second pool of potential jurors, should the first group not provide enough qualified jurors to seat a jury and three alternates.

The court has reviewed the questionnaires flagged by defendant.  She is correct that there are some responses that refer to having seen news coverage of the relevant events.  There are also some who have expressed opinions that could potentially disqualify them from serving on the jury, and others with the transportation and scheduling issues noted.  But especially given the number of jurors likely to be available, this information does not mean a change of venue is appropriate.

First of all, many of the transportation and scheduling conflict issues are unlikely to be remedied by a change in venue.  In a six-week trial where the potential jury pool comes from multiple counties, many of which are not close to the courthouse, there are bound to be a higher-than average percentage of scheduling conflicts and transportation challenges.

But even if the court struck all of the venire members McDonald believes should be struck, that is still less than half of the total potential jurors who should appear on that first day.  Assuming the ratio holds for the second set of potential jurors, there should be at least 75 people to choose from.  The court is confident that it will be possible to select a jury based on those numbers.

Moreover, all of the reasons that the court relied upon to deny the prior motion to change venue (Dkt. No. 64) still support denying that change of venue.  For these reasons, the renewed oral motion to change venue is DENIED.

**CONCLUSION**

It is ORDERED that the pending motions in this case are resolved as set forth above.

Entered: August 16, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge