IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Action No. 5:21-cr-00012 |
| v. | ) | |
| | ) | By:  Elizabeth K. Dillon |
| JENNIFER RAE MCDONALD, | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Pending before the court are two post-trial motions by defendant Jennifer Rae McDonald: a motion for judgment of acquittal (Dkt. No. 221) and a motion for new trial (Dkt. No. 222).  The United States has responded to both (Dkt. Nos. 231, 232), and McDonald has not filed a reply. The United States also recently filed a notice of supplemental authority relevant to the motion for new trial.  (Dkt. No. 233.)

For the reasons discussed below, the court will deny McDonald's motion for new trial and will deny in part and grant in part her motion for judgment of acquittal.  Specifically, the court will deny the motion for acquittal as to the aggravated identity theft in Count 18 and will grant the motion as to the bank fraud counts in Counts 14 through 17.  Consistent with Federal Rule of Criminal Procedure 29(d), the court also considers whether to conditionally grant a new trial in the event that its judgment of acquittal is reversed on appeal, and concludes that a new trial would not be necessary.  Thus, the court declines to conditionally grant a new trial as to Counts 14 through 17.

I.  BACKGROUND

At trial, the jury found McDonald guilty on all 34 counts in the indictment: seven counts of wire fraud, ten counts of bank fraud, one count of aggravated identity theft, and sixteen counts of money laundering.  In general terms, these counts stem from allegations that McDonald

employed a scheme to improperly obtain and use monies belonging to her employer, the Town of Front Royal and Warren County Economic Development Authority (EDA), for her own benefit.

Facts relevant to McDonald's motions will be discussed in context.

## II.  DISCUSSION

### A.  Motion for Judgment of Acquittal

In her first motion, McDonald renews her motion for a judgment of acquittal on Count 18 (aggravated identity theft) and Counts 14–17 (bank fraud).  With regard to the aggravated identity theft, she argues that the evidence was insufficient to show that she used a means of identification of another *during and in relation* to the wire fraud alleged in Count 1.  (*See* Motion 1, Dkt. No. 221.)  She argues that the bank fraud counts were infirm because there was no misrepresentation to United Bank that caused it to issue the relevant checks.  (*Id.*)

#### 1.  Standard of review

McDonald's motion for judgment of acquittal is made pursuant to Federal Rule of Criminal Procedure 29.  That rule provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  "A defendant challenging the sufficiency of the evidence faces a heavy burden . . . . "  *United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (internal citations and alterations omitted).  Specifically, "[t]he jury's verdict must stand unless . . . no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Royal*, 731 F.3d 333, 337 (4th Cir. 2013) (citing *Young*, 609 F.3d at 355).

Put differently, the motion should be denied if the jury's verdict on any given charge is supported by "substantial evidence."  *United States v. Alvarez*, 351 F.3d 126, 129 (4th Cir. 2003).  "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as

adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996).  In addressing a claim of insufficient evidence, moreover, this court must "view the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the [g]overnment . . . ." *Young*, 609 F.3d at 355 (citation omitted).

### 2. Count 18 – aggravated identity theft

The jury found McDonald guilty of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  To establish the offense of aggravated identity theft, the government was required to prove that McDonald (1) knowingly used, without lawful authority, a means of identification of another person (here, Truc Tran), (2) knew that the means of identification belonged to another person, and (3) used the means of identification during and in relation to the felony crime of wire fraud, as alleged in Count 1.  (Jury Instr. 48, Dkt. No. 215.)  McDonald agrees that this jury instruction was proper.  The government cites to the same instruction and does not dispute its correctness.  (Opp'n Mot. for Acquittal 4, Dkt. No. 232.)

Because the third element refers to the wire fraud offense in Count 1 and requires proof of that offense beyond a reasonable doubt, *United States v. Harrison*, 843 F. App'x 524, 525 (4th Cir. 2021), the parties also discuss the elements of that offense.  As to Count 1, the court instructed the jury that the government was required to prove that McDonald (1) knowingly devised a scheme or artifice to defraud or to obtain money by false pretenses, representations, or promises; (2) did so with the intent to defraud; and (3) in furthering or carrying out this scheme to defraud, transmitted or caused the transmission of a writing, sign, signal, picture, or sound by means of a wire communication in interstate commerce.  (Jury Instr. 26, Dkt. No. 215.)  The parties stipulated and agreed that the listed wire transfers constituted wire communications in interstate commerce.  (*Id.*)

3

a. *Facts*

The government summarizes the facts of the aggravated identity theft offense as follows:

> McDonald used Truc Tran's identity, his nickname 'Curt Tran,' and his specific position as the owner of the company ITFederal, for her LLC, Daboyz, to purchase a property known as Buck Mountain Road with stolen EDA money.  McDonald set up a ruse, i.e., that Tran was purchasing the property, in order [to] explain why the wire to purchase the property came from the EDA, when in fact, McDonald was purchasing the property and taking EDA funds for herself.

(*Id.* at 5.)  McDonald contends, however, that there was insufficient evidence from which the jury could find that the "means of identification" was used "during and in relation to" the wire fraud in Count 1.

Count 1 charged McDonald with wire fraud related to a September 14, 2016 wire transfer of $2 million from an EDA account held at the First Bank and Trust (First Bank) to an account held at Union Bank and Trust (Union) in the name of TLC Settlements, LLC.  Truc Tran was an individual who was doing business in Warren County in 2016 through his company ITFederal. Several witnesses testified at trial about knowing who Curt Tran was and that he was a businessman.  Tran testified at trial and explained that he generally used the name "Curt" as his first name, which is Truc spelled backward.  Tran further testified, though, that he never signed important or legal documents with the name "Curt Tran" because that was not his legal name, and he never initialed such documents with "CT".

In mid-2016, McDonald provided to TLC Settlements three contracts for the purchase of three parcels of real property the U.S. referred to as the Buck Mountain Road Property.  At first, the three contracts listed the buyer as "Curt Tran" and the sellers as William Vaught and Rappawan Inc.  (Trial Exs. 376A, 376B, and 376C.)  The contracts were purportedly signed and initialed by Tran, although Tran testified that he did not sign or initial these contracts, that he was not involved in the Buck Mountain Road property purchase in any way, and that the

4

signature on the contracts was not his.  Tran also pointed out, and the jury was shown, his true signature on another document.  (*See* Gov't Ex. 404.)

McDonald made out checks for the earnest money deposit and wrote in the memo line, "Tran."  (*See* Gov't Exs. 410A, 410B, and 410C.)  Vaught, the seller, testified that he believed he was selling the property to Tran, although he never met him.  McDonald had told Vaught that Tran was operating a farm for at-risk youth and wanted the Buck Mountain Road property for that reason.  Again, according to Tran, he had no interest in the Buck Mountain Road property and did not intend to operate a farm for at-risk youth.

McDonald initiated the transaction with TLC Settlements using her EDA mail account.  (Gov't Ex. 382.)  She emailed TLC Settlements on September 8, 2016, stating "Here is the contract for the Buck Mountain property.  Could you send me a draft HUD as soon as you get a chance so I can call and give him the information to wire the money?"  (*Id.*)  Two employees of TLC Settlements responded by asking, "Is he taking title as ITFEDERAL or personally?"  (*Id.*)  This establishes that TLC Settlements believed the transaction involved Tran and that McDonald was saying that she would give Tran the wire information.  McDonald responded, "On all 3 he is actually leaving the country on Monday for 2 months so he has formed an LLC so that I can and one other person sign the paperwork for him.  It will be in the LLC's name.  And Christy will love the name of my LLC . . . . Daboyz, LLC. Lol 😊 I am getting the paperwork together to change the name on the contract."  (*Id.*)  Thus, McDonald again was using Tran's identity and was representing that she was acting on his behalf.  As Tran testified, however, he had no involvement in, or knowledge of, the transactions.

McDonald then emailed TLC Settlements a copy of a contract addendum that changed the original contracts from "Curt Tran" to Daboyz, LLC.  (Gov't Ex. 383.)  Tran testified that he did not sign this document or write the addendum and that the signature did not match his true

signature.

McDonald then caused a wire of $2 million to be transferred from the EDA's account at First Bank to TLC Settlement's account at Atlantic Union Bank. In order to explain to TLC Settlements why the funds were coming from an EDA account, McDonald told TLC to expect a wire, representing that "[t]he purchaser for Buck Mountain put it in an EDA account and we cannot keep it there, so I told bank to transfer to you guys. It should be $2 million." (Gov't Ex. 384.) TLC Settlements, acting as settlement agents for the sale—and having been told that the funds were coming from the purchaser (Tran) but routed through the EDA—then disbursed the funds as set forth on the disbursement statement. (Gov't Ex. 380.) As a result of the transaction, McDonald took title to the Buck Mountain Road property through her LLC, Daboyz, LLC. (Gov't Exs. 411A and 411B.)

McDonald argues that the use of Tran's identity was not during and in relation to the wire fraud and that it was not at the crux of the crime, as required by *Dubin v. United States*, 599 U.S. 110 (2023). From a factual standpoint, McDonald emphasizes that the wire transfer at issue in Count 1 was the $2 million transfer from EDA's account at First Bank to TLC Settlements. She points out that the evidence regarding *that* transfer was presented primarily through Robert Boyd, a former account officer at First Bank. He testified that the $2 million was wired to TLC Settlements purportedly for an escrow fund required by the Virginia Department of Transportation (VDOT) for the Leach Run Parkway project. In particular, McDonald represented to Boyd that the $2 million was needed to fund a VDOT escrow account. (Gov't. Exs. 391, 298.) This was not true, as evidenced by the testimony of VDOT employee Steven Damron, who explained that VDOT did not require the EDA to put $2 million in an escrow account for the Leach Run Parkway project.

   b.   *Analysis*

   In her motion for acquittal, McDonald focuses on the fact that the misrepresentations

made to First Bank to cause it to wire the funds did not use Tran's name at all.  Instead, the

misrepresentations were based on statements about VDOT's requiring escrow funds.  Thus, she

argues that, even if McDonald's use of Tran's name to TLC Settlements was "sufficient to prove

the possession, transfer, or use of another's means of identity, the government did not present

evidence that this use was 'during and in relation to' the predicate wire fraud in Count [1]."

(Mot. Acquittal 7.)  As a result, her argument continues, any use of Tran's identity was not

"during" or "in relation to" the wire fraud alleged in Count 1, and certainly was not both, as

required by the third element of the aggravated identity theft offense.

   McDonald relies in large part on *Dubin* to argue that any use of Tran's identity was not in

relation to the relevant wire fraud.  In *Dubin*, the defendant overbilled Medicaid for

psychological testing by submitting false claims to Medicaid that overstated the qualifications of

persons who had provided services and changed the dates on which patient examinations

occurred.  599 U.S. at 114.  Those claims included the names of actual patients, and the United

States prosecuted Dubin and obtained a conviction for aggravated identity theft.  In reversing the

conviction, the Court discussed the meaning of the statute's requirement that a defendant "uses"

another's means of identification and the "in relation to" requirement.  *Id.* at 116–17.

   The Supreme Court rejected the government's broad reading of both of those terms and

instead reasoned that aggravated identity theft requires that the "means of identification" "play[]

a key role," *id.* at 129, or be a "key mover in the criminality," *id.* at 122–23.  In particular, the

means of identification must be "at the crux of the underlying criminality, not an ancillary

feature of billing." *Id.*  "[T]he means of identification specifically must be used in a manner that

is fraudulent or deceptive.  Such fraud or deceit going to identity can often be succinctly

summarized as going to 'who' is involved." (*Id.* at 132.)

McDonald contends that Tran's identity was not involved in or at the heart of the wire fraud in Count 1, but the court disagrees. It is true that Tran's identity was not used in direct communication with First Bank, but both that wire transfer and the subsequent transfer from TLC to Daboyz, LLC were part of the "scheme to defraud" that was the first element of the wire fraud offense. As part of that scheme, money was transferred from First Bank to TLC Settlements, and, as part of the same scheme, McDonald obtained property by false pretenses. Put differently, Tran's name may not have been used directly to trigger First Bank to wire the $2 million to TLC Settlements (the third element of the wire fraud claim), but his name certainly was used in the overall fraudulent scheme for McDonald to obtain the $2 million (for her LLC and in the form of property), which is the first element of the wire fraud claim.

As the government explains, the purpose of the fraudulent transaction undertaken by McDonald was for her to obtain the $2 million from the EDA, but not "merely to send" the money "anywhere, but rather, to acquire property in the name of her LLC. That transaction required deceiving both the financial institution to release the funds *and* the settlement agent, TLC Settlements, to accept funds coming from an EDA account." (Opp'n to Mot. for Acquittal 6.) McDonald utilized Tran's name and identity in order to deceive TLC Settlements into accepting a wire from the EDA and then processing a transaction giving the property to McDonald's LLC. The evidence could have allowed the jury to find that she chose Tran, as opposed to some other name like John Smith, because TLC Settlements did business with Tran and his company and would believe that he was purchasing property worth millions of dollars. The use of Tran's name also allowed the seller to believe the transaction was legitimate. As the United States notes, "[h]ad McDonald been forthcoming by telling the parties involved that she was taking $2 million from the EDA and diverting the funds to her personal LLC, suspicions

8

would have been raised."  (Opp'n to Mot. for Acquittal 7.)  She was able to avoid those suspicions precisely because she utilized Tran's name, identity, and forged signature, and she repeatedly represented to TLC Settlements that she was acting on Tran's behalf.

Additionally, the court has carefully reviewed *Dubin*, but does not find that it compels a different result.  The court agrees that the facts here are not what is characterized as "classic identity theft."  *Dubin*, 599 U.S. at 126 (quoting *Flores-Figueroa v. United States*, 556 U.S. 646, 656 (2009)).  Examples of "classic" cases are (1) where a defendant has taken possession unlawfully, such as going "through someone else's trash to find discarded credit card and bank statements"; (2) a bank employee who passes along customer information to an accomplice, and thus transfers it unlawfully; or (3) a defendant who uses "another person's identification information to get access to that person's bank account."  *Dubin*, 599 U.S. at 126 (quoting *Flores-Figueroa*, 556 U.S. at 656).

But this case also is a far cry from *Dubin* factually.  The use of Tran's name here was more substantial than the use of the patients' names in *Dubin* and certainly not just "ancillary to billing" as in *Dubin*.  There, the fraud had nothing to do with the patients' names and, indeed, their names themselves were not misused or misrepresented.  By contrast, McDonald, as part of her scheme to defraud and without Tran's knowledge or permission, indicated to TLC settlements that Tran was purchasing the property at issue, that she was acting on his behalf, and that Daboyz was an LLC being used by him.  The fraudulent scheme also included forging his initials and signature.  Thus, the use of Tran's name played a key role in getting TLC Settlements to accept the funds and in McDonald's scheme to obtain the funds.  *See Dubin*, 599 U.S. at 123 ("When a means of identification is used deceptively, this deception goes to 'who' is involved, rather than just 'how' or 'when' services were provided.").

The court believes that this case is similar factually to the Eleventh Circuit's post-*Dubin*

decision in *United States v. Gladden*, 78 F.4th 1232, 1245 (11th Cir. 2023). There, the defendants worked at a compounding pharmacy and were involved in a scheme where they received inflated reimbursement payments by billing for medically unnecessary and fraudulent prescriptions. One of the defendants, Linton, "deliberately changed the addresses on file" for several patients so that the company could continue billing for prescriptions for them, but the drugs were instead sent to a co-conspirator. 78 F.4th at 1245. The *Gladden* court rejected the defendant's argument, which relied on *Dubin*, that her conduct did not constitute aggravated identity theft. It explained:

> Linton's forgery of the Edenfields' and Wester's identities is at the heart of the deception: Linton used the identities of the Edenfields and Wester to continue refilling prescriptions in their names, even though they were neither aware of nor received any products. Because the deception centered on the identity of the individual receiving the product, Linton committed identity theft. *See Dubin*, 143 S. Ct. at 1568 ("This central role played by the means of identification, which serves to designate a specific person's identity, explains why we say that the 'identity' itself has been stolen."). The use of the fraudulent identities was central to the scheme at [the company]; Linton's fraudulent representation that individuals such as the Edenfields and Wester were the recipients of the prescriptions issued in their names directly enabled [the company] to continue billing for medically unnecessary prescriptions.

*Id.*

Similarly, at least part of the deception in the wire fraud scheme, designed so McDonald could use EDA funds to purchase the Buck Mountain Road property, was to utilize Tran's identity, without his permission or knowledge, and to tell TLC Settlements that she was acting on his behalf to purchase the property. The court believes that this constitutes "use" of Tran's name both during and "in relation to" the wire fraud set forth in Count 1. Thus, the court will not disturb the jury's verdict as to Count 18.

### 3.  Counts 14–17 – bank fraud

McDonald next challenges the jury's verdict as to four of the bank fraud counts, Counts 14–17, in which they found her guilty of violating 18 U.S.C. § 1344(2).  Each of the four counts references a payment in a specific amount "in the form of a check drawn on an account held at United Bank in the name of the EDA and deposited for the benefit of" McDonald's personal credit card.  (*See* Indictment 6–7, Dkt. No. 5; Verdict Form 3–4, Dkt. No. 214; *see also* Gov't Exs. 132, 134, 136, 153 (front of each of the four checks).)

> *a.  Facts*

For each of these counts, the government provided evidence about transactions involving both First Bank, where EDA held a line of credit (LOC), and United Bank, where EDA held the checking account on which the four checks were drawn.  McDonald was an authorized signer on both accounts, and both accounts are listed as containing "public funds."

At trial and in response to the motion for acquittal, the government discusses each of the bank fraud counts in conjunction with the corresponding wire fraud counts.  In particular, the government explains that each of the four transactions was initiated by McDonald by her submission of false 2EastMain, LLC invoices to First Bank.  In each of these four instances, she requested draws on the LOC for the amount in the false invoice, and each time the draw on the LOC was approved by First Bank.  First Bank then sent the requested amount to EDA's checking account at United Bank, where the funds were then available.  After each transfer, a check was written from EDA's United Bank checking account in the same amount.  Three of these checks were made payable to Sears (consistent with the directions on the false invoice), and were used to pay down the balance on McDonald's personal Sears credit card.  The fourth was made payable to Chase, consistent with the false invoice, and was used to pay down the balance on McDonald's personal credit card issued by Chase.

11

There was general evidence about how EDA checks were processed from which the jury could find that each of the four checks drawn on the United Bank account was prepared by EDA's part-time bookkeeper, at McDonald's request and pursuant to McDonald's instructions. McDonald signed three of the four checks and obtained the signature of a board member as a second signature.  On one of them, only two board members signed the check.  Several board members testified that McDonald often brought them checks to sign, along with supporting invoices.  The checks were all honored by United Bank, and so public EDA funds were used to pay down McDonald's personal credit cards.  The jury heard testimony from board members stating that McDonald was not authorized to use EDA funds to pay her personal credit card bills.

     *b.  Analysis*

The jury was instructed that, to prove bank fraud, the government was required to prove three elements: (1) "The defendant knowingly executed a scheme to obtain any of the moneys, funds, credits, assets, or other property owned by or under the control of a financial institution, by means of materially false or fraudulent pretenses, representations, or promises;" (2) "The defendant did so with the intent to defraud;" and (3) "The financial institution was then insured by the United States."  (Jury Instr. 33, Dkt. No. 215.)  The court also instructed: "To prove the 'by means of' requirement of bank fraud, the government must prove that the allegedly false or fraudulent statement(s) was the mechanism naturally inducing a bank to part with its own money or money under its control."  (Jury Instr. 35.)

The last instruction was taken from *Loughrin v. United States*, 573 U.S. 351 (2014). *Loughrin* clarified a number of aspects of bank fraud, including that § 1344(2) does not require proof that the defendant intended to defraud a bank, *id.* at 356, or proof that the scheme "created a risk of financial loss for the bank," *id.* at 366 n.9.  Also, the false statement need not be made directly to the bank.  *Id.* at 363.  But the court emphasized that the "by means" of language

requires a "relational component" between the money in the bank's custody and a defendant's lies and that but-for causation is not sufficient.  *Id.* at 362-63.

In *Loughrin*, the defendant presented a counterfeit check to Target to purchase goods, and the Court concluded that was sufficient to satisfy the "by means of" element.  *Id.* at 363–64.  The Court reasoned that presenting a counterfeit check to a merchant for payment is no less the "means" to obtain payment than if the defendant presented it to the bank itself: "[I]n either case, the forged or altered check—*i.e.*, the false statement—serves in the ordinary course as the means . . . of obtaining bank property."  *Id.*

The arguments by the parties on this issue are similar to those they made in conjunction with defendant's Rule 29 motions at trial.  (10/26/23 Tr. at 80–118, Dkt. No. 228.)  The court denied the motions in a brief, oral ruling.  (*See* 10/31/23 Tr. at 55–57, Dkt. No. 229.)  Upon further consideration, however, the court believes that McDonald's arguments are convincing as to these four counts only.

To briefly summarize, McDonald contends that the government is conflating the wire fraud counts in Counts 4 through 7 (which were based on the wires sent from First Bank to United Bank) and the four bank fraud claims.  She insists that the four bank fraud counts are infirm because "there was no misrepresentation to United Bank that caused it to issue these checks."  (Mot. for Acquittal 9–10.)  Each of the four counts involved a check drawn from EDA's own checking account, and each check was signed by two authorized EDA representatives.  McDonald also emphasizes that Heather Clatterbuck, a United Bank manager at the time, testified that United Bank did not require any documentation for the EDA to withdraw funds from its own deposit account, and that McDonald was authorized to withdraw funds from EDA's accounts at United Bank.  As such, the checks were valid checks and were issued without any misrepresentations to United Bank.  (Mot. for Acquittal 11.)

13

The United States disagrees and claims that the information contained on the face of the checks themselves was false (such as referencing false invoices in the memo line), as was the fact that the account was specifically designated as public funds but being used to pay McDonald's personal credit cards.  (Opp'n to Mot. for Acquittal 13.)  Thus, the government asserts, McDonald made misrepresentations directly to United Bank that constituted bank fraud.  (*Id.* at 14–15.)  The government also asserts that the misrepresentations to First Bank satisfy the "by means of" requirement as required by *Loughrin*.

The court has considered the arguments of the parties, and it concludes that a faithful application of the "by means of" requirement reveals that McDonald did not obtain the money *from United Bank* "by means of" fraud.  To be sure, there was ample evidence that she obtained the money from First Bank and had it transferred to United Bank through fraud, but those misrepresentations and those transactions underlie the wire fraud counts, which McDonald does not challenge in her motion.  None of the misrepresentations *to United Bank*, however, was "the mechanism naturally inducing" United Bank to honor the checks.

McDonald and the other signers of the check were authorized to sign those checks, and there was no evidence at trial introduced to show that any of those signatures were forged.  The fact that McDonald was misrepresenting *to EDA Board Members* the purposes of those checks in order to get their signature means she defrauded the EDA, or she was embezzling and misusing public funds.  But that fact, without more, does not mean that a misrepresentation was made to United Bank that induced it to release the funds.

Likewise, the descriptions on the "memo" lines of some of the checks were fictitious and referred to the fictitious invoices, but there was no evidence that United Bank looked to the memo lines in honoring the checks or that it was required to do so.  The testimony of United Bank's manager was that the bank did not require any documentation from an account holder

14

who is withdrawing funds from their own account.  And because these checks were all signed by a person or persons at EDA authorized to sign the checks for its account, United Bank paid the checks.  Similarly, the mere fact that the funds were public funds and that McDonald was misusing the funds for herself by making misrepresentations to others signing the checks does not mean that United was induced by any misrepresentation.

The court recognizes that *Loughrin* does not require that the misrepresentation must be made to the bank itself, and the facts of that case confirm that.  But unlike in *Loughrin*, where the forged check given to Target likely would be presented to the bank for payment, the misrepresentations to First Bank simply served to transfer funds to United Bank, but were not misrepresentations that were passed on, or were likely to be passed on, to United Bank, nor did those misrepresentations trigger United Bank to pay its checks.

For these reasons, the court will grant the motion for acquittal as to Counts 14 through 17.

### c. Conditional motion for new trial

Federal Rule of Criminal Procedure 29 provides that "[i]f the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The court must specify the reasons for that determination."  Federal Rule of Criminal Procedure 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Fourth Circuit has instructed that a district court may not "simply harken[ ] back to its acquittal analysis" and must provide "further elaboration" beyond the acquittal analysis if it conditionally grants a new trial. *United States v. Rafiekian (Rafiekian I)*, 991 F.3d 529, 549–50 (4th Cir. 2021); *see also United States v. Millender*, 970 F.3d 523, 531 (4th Cir. 2020) (remanding a new trial motion to the district court where the court "offered only a single

15

sentence to explain its decision to order a new trial" which pointed back to the acquittal analysis).  For purposes of determining whether to conditionally grant a new trial, the court will assume that there was sufficient evidence to sustain the convictions on Counts 14 through 17.

As the court discusses in addressing McDonald's motion for new trial, *infra*, a court assessing a Rule 33 motion must conduct a "global assessment of the evidence" and "weigh" whatever evidence it has before it.  *United States v. Rafiekian* (*"Rafiekian II"*), 68 F.4th 177, 186 (4th Cir. 2023).  In doing so here, the court concludes, as it does in addressing McDonald's motion for new trial, that there was ample and convincing evidence that McDonald engaged in a widespread scheme of misrepresentation employing various means, and that she improperly obtained millions of dollars of EDA money for her own use.  The question on which the court's rulings on Counts 14 to 17 hinges is whether the evidence was sufficient as to those specific counts to establish bank fraud, given the causation requirement of that offense.  Put differently, the facts of these offenses are not in dispute, and the court's ruling focuses on whether the undisputed facts satisfy the legal requirements to prove bank fraud.  Therefore, if the Fourth Circuit were to determine that the evidence satisfies the causation element, therefore, there is no basis to grant a new trial.

## B.  Motion for New Trial

In her motion for new trial, McDonald argues that two alleged errors by the court require a new trial.  First, she argues that the court's exclusion of the grand jury testimony of J.W. was erroneous.  Second, she argues that the court erred when it sua sponte gave an additional instruction to the jury after closing arguments that allegedly undermined defendant's closing argument.

### 1.  Legal Standard

Federal Rule of Civil Procedure 33 allows a district court, "[u]pon the defendant's

16

motion, [to] vacate any judgment and grant a new trial if the interest of justice so requires."
The standard for granting a new trial depends, in part, on the grounds advanced by the moving
party, but a district court "should exercise its discretion to grant a new trial sparingly . . . ."
*United States v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012) (internal citations and alterations
omitted).  The overriding factor is that the "interest of justice" must require it.

A new trial may be granted because evidence was improperly admitted or excluded, if
that likely influenced the verdict.  *Cf. United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018)
(denying motion for new trial premised on various grounds, including inadmissible testimony);
*United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003).  In ruling on a Rule 33 motion,
moreover, the court does not view the evidence in the light most favorable to the government.
*United States v. Miller*, 41 F.4th 302, 315–16 (4th Cir. 2022).  The court may consider the
strength of the evidence, and "it may evaluate the credibility of the witnesses."  *United States v.
Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).  In particular, a court may grant a new trial
where the evidence of guilt was arguable or marginal and an adverse verdict thus likely was
influenced by errors made at trial.  *See, e.g.*, *United States v. Russell*, 221 F.3d 615, 621 (4th Cir.
2000).

### 2.  J.W.'s grand jury testimony

The issue of whether to admit the prior grand jury testimony of J.W. into evidence was
argued at trial, and the court issued a written ruling excluding the evidence.[1]  Having reviewed
its prior ruling (Dkt. No. 199), the court continues to believe it was correct and, regardless, the
court does not find that the "interest of justice . . . requires" a new trial based on the exclusion of
this evidence.

On this issue, McDonald argues first that, even if otherwise inadmissible, the United

---

[1]  The court assumes the reader's familiarity with that ruling.

States opened the door to J.W.'s grand jury testimony by eliciting testimony about from where the purported settlement agreement came and whether an EDA board member had sent it to J.W. In response, the United States correctly notes that it was defendant's counsel who first elicited any testimony concerning where McDonald's prior attorney obtained a copy of the purported settlement agreement as well as first identifying the name J.W.  Thus, it was the defendant who first elicited testimony that the agreement came from J.W. and the defendant who first elicited any testimony about the identity of J.W.  (*See* 9/14/23 Tr. 181–82, Dkt. No. 230.)  As such, the court agrees with the United States that the government did not "open the door" so as to allow the otherwise inadmissible evidence.

Second, McDonald argues that the court failed to follow the Fourth Circuit's standard as to whether the government had a "similar motive" for questioning J.W. before the grand jury as the motive it would have in opposing the testimony at trial.  Indeed, McDonald contends that the court improperly "considered standards . . . set by other circuits" as to whether a "similar motive" exists for purposes of Rule 804(b)(1), including the Second Circuit's decision in *United States v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (en banc).  (*See* Mot. for New Trial 7, Dkt. No. 222.)  But the Fourth Circuit has recently expressly adopted—in a published opinion—the Second Circuit's standard on this issue.  *United States v. Huskey*, __ F. 4th __, 2024 WL 100193 (4th Cir. Jan. 8, 2023) ("The government argues—and we agree—that [*DiNapoli*] sets out the appropriate legal standard.")  The court thus rejects McDonald's second argument.

Along with the reasons already set forth by the court in its written ruling, an additional reason discussed by the United States in its opposition to the new trial supports the court's ruling.  In particular, the court noted in its ruling that it was not making a determination as to whether J.W.'s grand jury testimony was false, but also noted concerns about the reliability of the testimony.  (Sealed Mem. Op. 12, Dkt. No. 199.)  These same concerns make it highly

unlikely that the jury would have believed J.W.'s grand jury testimony had it been permitted. Thus, the court cannot conclude that, even if it was an error to exclude that information, the error so infected the trial as to warrant a new trial.

As the United States reasons in its opposition:

> Admission of J.W.'s grand jury testimony would not have changed the verdict reached by the jury. Following the government's case in chief proving conclusively that the settlement agreement was forged, the jury would not have believed that an EDA Board Member[footnote omitted] sent J.W.—a person with absolutely nothing to do with the EDA—a document purportedly so secret that the payments it authorized were set up to look like fraud to deflect public attention. Neither would the jury have believed that J.W. kept this document, with so little import to him, in a drawer for years just to be discovered when McDonald was in trouble. And the jury would most certainly not have believed this story coming from the very person [the jurors] had already seen advised McDonald to get a burner phone, and with whom McDonald discussed and shared drafts of other forged documents and false exculpatory plans. Exs. 592A, D, G, 593. In addition, if J.W.'s grand jury testimony had been admitted, the government would have presented impeachment evidence (public records admissible through SA Hasty pursuant to FED. R. EVID. 806) showing that J.W. had a federal fraud conviction and a bias in favor of helping a witness he planned to call in his own criminal case. Under these circumstances, it is highly probable that exclusion of J.W.'s grand jury testimony had no effect on the verdict.

(Opp'n to Mot. for New Trial 12, Dkt. No. 231.)

For all of the reasons discussed in this section, the exclusion of J.W.'s grand jury testimony does not warrant a new trial.

### 3.  Jury Instruction 50A

The second error on which McDonald bases her motion is the court's giving of Instruction 50A, and, in particular, the timing of it.  For the reasons discussed next, the court does not find that its giving of the instruction—which defendant does not contest is a correct statement of the law—violated the defendant's rights or requires a new trial.

After the closing arguments, the court was concerned that defendant's argument

improperly suggested to the jury that the government was required to call all witnesses with relevant knowledge—which is not a correct statement of the law.  Thus, it proposed what became jury instruction 50A, which stated:

> Although the government is required to prove the defendant guilty beyond a reasonable doubt, the government is not required to present all possible evidence related to the case or to produce all possible witnesses who might have some knowledge about the facts of the case. In addition, as I have explained, the defendant is not required to present any evidence or produce any witnesses. The burden remains with the government.

(Jury Instr. 50A, Dkt. No. 215.)

As noted, McDonald does not contend that the instruction is not a correct statement of the law.  Instead, she takes issue with the timing of the instruction, after other substantive instructions had been given and immediately following closing arguments.  She contends that the timing made it appear that the court was disagreeing with, or invalidating, a portion of her argument.[2]

Even if the timing of the court's instruction was improper, however, the giving of that instruction would require a new trial only if the court's action also prejudiced defendant, *i.e.*, the error "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *See United States v. Higgs*, 353 F.3d 281, 330 (4th Cir. 2003) (quoting *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) and applying the test to a prosecutor's improper comments during trial); *United States v. Harvey*, 532 F.3d 326, 336 (4th Cir. 2008) (explaining

---

[2] McDonald also suggests that the timing violated Federal Rule of Criminal Procedure 30, citing authority interpreting that rule as requiring that the district court inform parties *before* closing as to its ruling on requested instructions and stating that the giving of a supplemental instruction must be examined carefully because a "defendant must have an adequate opportunity to argue his innocence under the district court's instructions in order to be assured a fair trial."  *United States v. Horton*, 921 F.2d 540, 546–47 (4th Cir. 1990).  In response, the government contends that rule is inapplicable here, where the court sua sponte gives an instruction to correct a misleading closing argument.  Regardless, and as discussed in the text, even if the timing of the instruction constituted court error, the court does not find sufficient error to grant a new trial.  As the *Horton* court explained, "[a] violation of Rule 30 requires reversal only when the defendant can show actual prejudice."  *Id.* at 547.

that a new trial is warranted based on a judge's comments during trial only if they were "so prejudicial as to deny the defendant an opportunity for a fair and impartial trial") (cleaned up and citations omitted).  The court cannot conclude that its instruction or the timing of it denied the defendant due process and a fair trial.  The instruction was given with other instructions to the jury and it was a balanced statement that reminded jurors that the burden of proof always remained with the government.  Moreover, even if the jury had interpreted the instruction as the court's disagreeing with the defendant, the court also instructed the jury that "the actions that I have taken during the course of the trial in ruling on motions or objections, and any statement or comment I have made or question I have asked in this case, are not to be taken by you as any indication by me as to how you should decide the facts."  (Jury Instruction 1, Dkt. No. 215, at 3.) Jurors are presumed to follow a court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

Further, having been present the entire trial and having heard all of the evidence, the court believes the evidence against McDonald was strong and compelling.  The jury had heard from witnesses and saw numerous documents showing the extent of McDonald's misrepresentations concerning a whole host of financial transactions.  Given the entirety of the evidence, moreover, the defense that these transactions were all authorized by a secret and confidential settlement agreement was improbable, to say the least.  The fact that the court noted that the government was not required to call all available witnesses, shortly after the defendant's argument that the government should have called more witnesses, did not prejudice defendant. In short, there was ample evidence to support McDonald's convictions, and the court simply does not believe that this instruction—regardless of its timing—was likely to have affected the jury's decision in any way.  Accordingly, the motion for new trial based both on the giving of the instruction and the timing of it is denied.

## III.  CONCLUSION

For the foregoing reasons, the court will deny in part and grant in part McDonald's motion for judgment of acquittal and will deny her motion for new trial.  An appropriate order will be entered.

Entered: January 23, 2024.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge

22