CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 24, 2024
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) Criminal Action No. 5:21-cr-00012 |
| v. | ) |
| | ) By: Elizabeth K. Dillon |
| JENNIFER RAE MCDONALD, | ) United States District Judge |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

On April 9, 2024, the court held the first part of Jennifer Rae McDonald's sentencing hearing. At the hearing, the court ruled on some of the parties' objections, directed the amendment of certain paragraphs of the Presentence Investigation Report (PSR), and took some objections under advisement. Additionally, the parties have now briefed the motion for a judgment of forfeiture and will be heard on that issue on May 29, 2024, at the second part of the sentencing hearing. This opinion and order addresses the outstanding objections.

I. OUTSTANDING OBJECTIONS TO THE PSR

**A. Government's Objection #6 and McDonald's Objection #17 (to paragraph 113 of the PSR)**

The parties presented their positions on this objection, and the court indicated it would edit that paragraph as appropriate. Accordingly, the court hereby AMENDS paragraph 113 of the PSR to read as follows, with additions italicized and deletions struck out:

> 113. ~~On January 3, 2024, A~~ United States Trustee notified the U.S. Attorney's office that she was making a referral for criminal prosecution of the defendant for committing the crime of bankruptcy fraud. The Trustee determined that the defendant had created a false settlement agreement between herself and the EDA in an attempt to avoid the consequences of the criminal activity she was found guilty of by jury trial. The Trustee found that she~~ *During defendant's bankruptcy proceeding, defendant provided, though her bankruptcy attorneys, the same document that was*

> *introduced at trial as a purported settlement agreement of sexual harassment allegations. She* repeatedly made false oaths on her bankruptcy filings, repeatedly testified falsely under oath, and submitted false documents through her attorneys.

**B. McDonald's Objection #2 (to paragraph 6 of the PSR)**

McDonald objects to the amount of the gambling losses included in paragraph 6 on the grounds that the reports on which that figure is based should not be relied upon for accuracy and that the figures do not include loss based on casino "free play" money that she received. Thus, she contends that the amount does not "represent the true amount of any loss she incurred based on use of her own actual money."

The court has reviewed its notes and a rough transcript of the testimony of Ms. Gatto on this issue. To be sure, Ms. Gatto testified that the figures on the win/loss statements did not capture any activity that took place without a player card inserted. They also did not capture some free slot play. For example, if a person played $100 of free slot play and won, but then won $500 and lost $500, the $500 would be reflected in the total loss amount even though none of the person's own money was actually lost. As the government conceded, the win/loss statements are used for marketing purposes, and Ms. Gatto testified that the casino tells players they should not be relied on for tax purposes. But Ms. Gatto did not testify that the figures were inaccurate, and she stated that the casino used them for regulatory purposes.

In light of that information, the court hereby amends paragraph 6 of the PSR to read as follows, with additions italicized and deletions struck out:

> The VSP's investigation revealed the defendant had purchased multiple properties in and around the Warren County area. Within the community questions arose as to how she was making these purchases. In response, the defendant spoke to the media. She represented to the local media that she was able to make such purchases with her winnings from playing slot machines in Charles Town, West Virginia. She claimed to have won over $1.8 million

2

dollars between 2015 and 2018. However, records received from the casino *reflected* ~~represented~~ that while the defendant had in fact won numerous jackpots from the slot machines from January 2014 through September 2018, *the best estimate shows* ~~she actually incurred a~~ *an appropriate* net loss of $753,207.32 during that time period. *This loss amount does not include some free slot play or play without a player card. Defendant*~~She~~ eventually admitted to the VSP that she had a gambling addiction and had borrowed the maximum amount on her credit cards and mortgaged properties to fund this habit and had also borrowed large amounts of money from her relatives.

### C. The Abuse-of-Trust Enhancement Under U.S.S.G. § 3B1.3 With Regard to the Money Laundering Offense Level

The court is required to calculate offense levels under wire and bank fraud and under money laundering separately and then apply the higher of the offense levels. The initial PSR calculated a higher guideline under wire and bank fraud and used that guideline. The United States objected, and the probation officer then amended the PSR to use the money laundering guideline. McDonald objects, arguing that the money laundering guideline was not calculated properly because the abuse-of-trust enhancement was improperly applied.

Section 3B1.3 provides for a 2-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." But, when calculating the offense level under the money laundering guidelines in § 2S1.1, the abuse-of-trust enhancement applies only if it is related specifically to the money laundering offenses. U.S.S.G. § 2S1.1, Application Note 2(c); *United States v. Arellanes-Portillo*, 34 F.4th 1132 (10th Cir. 2022); *United States v. Capps*, 977 F.3d 250 (3d Cir. 2020). The United States, by email submitted to the court and counsel on April 10, 2024, agreed that this authority controls and that the court must determine if McDonald abused a position of trust specifically with regard to the money laundering offenses.

It is clear to the court, and no one argues to the contrary, that McDonald used her position as Director of the EDA to carry out the wire and bank fraud offenses. The United States

3

maintains that the abuse-of-trust enhancement also applies to the money laundering because that activity occurred when the original owners of the Buck Mountain properties bought the property back from DaBoyz (McDonald's LLC) at a lower price a little over one month after the original sale of the properties to DaBoyz.  For support, the United States directs the court to paragraphs 74 and 75 of the PSR and to its trial exhibits 387 and 388.  It asserts that McDonald used her EDA email account to orchestrate the original owners' "buyback" of the Buck Mountain properties from DaBoyz, which is the conduct at issue in money laundering Counts 19 and 20.

Having reviewed those documents and related trial testimony, the court finds that the abuse-of-position-of-trust enhancement does not apply to the money laundering guideline calculation.  While it is difficult to separate the use of McDonald's position of trust as EDA Director amongst different parts of ongoing transactions, especially when she provided false explanations throughout her dealings, the court looks to the specific information relied upon by the government.  As PSR paragraph 74 notes regarding the initial Buck Mountain sale (wire/bank fraud), Vaught, one of the original Buck Mountain property owners, contacted McDonald at the EDA office to ask why the property was being sold to DaBoyz, LLC, instead of Tran.  McDonald provided him with false information to explain it.  PSR paragraph 75 discusses Vaught's questioning of the buyback of the property and why Tran would want to sell it back so quickly at a loss.  This paragraph, however, does not mention McDonald.  Rather, it appears that a different realtor (one of the realty company owners and a relative of McDonald) provided the false explanation for the buyback.  The trial exhibits referenced by the government are two emails from McDonald (at her EDA email address) to employees at the settlement company handling the DaBoyz end of the buyback.  In one of those emails, McDonald falsifies an explanation to those employees about why Tran is selling the property back to the original owner, but there is no indication from their trial testimony that those employees relied on the

4

false explanation regarding the settlement of that transaction, or the fact that it was coming from the EDA Director. Thus, the court will not apply the abuse-of-trust enhancement to the money laundering guideline calculation.

**D. Proper Guidelines Calculation**

As noted above, the guidelines direct the court to determine the total offense level under both the money laundering and the wire/bank fraud counts and then to apply whichever results in the highest guideline range. The following chart shows the court's comparison of the two, based on the findings it has made:

| Under Money Laundering Guideline, § 2S1.1 | | Under Wire & Bank Fraud Guideline, § 2B1.1 | |
|---|---|---|---|
| Base Offense Level under § 2S1.1(a)(1) (determined by reference to § 2B1.1(a)(1)) | 7 | Base Offense Level, § 2B1.1(a)(1)) | 7 |
| Loss amount § 2B1.1(b)(1)(J) | +18 | Loss amount § 2B1.1(b)(1)(J) | +18 |
| Substantial hardship, § 2B1.1(b)(2)(A) | +2 | Substantial hardship, § 2B1.1(b)(2)(A) | +2 |
| Misrepresentation on behalf of a political organization or government agency and during the course of a bankruptcy proceeding, § 2B1.1(b)(9) | +2 | Misrepresentation on behalf of a political organization or government agency and during the course of a bankruptcy proceeding, § 2B1.1(b)(9) | +2 |
| Sophisticated Means, § 2B1.1(b)(10)(C) | +2 | Sophisticated Means, § 2B1.1(b)(10)(C) | +2 |
| More than $ 1 million from one or more financial institutions, § 2B1.1(b)(17) | +2 | More than $ 1 million from one or more financial institutions, § 2B1.1(b)(17) | +2 |
| Conviction under 18 U.S.C. § 1957 adds one level, § 2S1.1(b)(2)(A) | +1 | Not applicable | |
| Abuse of Trust (court ruled inapplicable), § 3B1.3 | ---- | Abuse of Trust, § 3B1.3 | +2 |
| Adjustment for Obstruction, § 3C1.1 | +2 | Adjustment for Obstruction, § 3C1.1 | +2 |
| | | | |
| Adjusted Offense Level and Total Offense Level | 36 | Adjusted Offense Level and Total Offense Level | 37 |

Because the bank and wire fraud guideline results in the higher offense level for this guideline grouping, the court uses that guideline and concludes that the total offense level is 37.

E. **Restitution Amount**

The parties disagree as to the proper amount of restitution in this case. The United States calculates the total calculable losses payable to the EDA for full restitution at $5,201,329 as follows:

| Portion of Scheme | Stolen EDA Funds |
|---|---|
| Payments to McDonald's Credit Cards - Counts 4, 5, 6, and 7 and Additional Executions of Scheme | $872,230 |
| Purchase of 400 Craig Avenue - Count 8 | $372,000 |
| 118 Jutland Court - Count 9 | $285,000 |
| 1309 Robinhood Lane - Count 10 | $110,000 |
| Buck Mountain Properties - Counts 1 and 11 | $2,000,000 |
| 1321 Happy Creek - Counts 2 and 12 | $1,007,672 |
| 2951 Rileyville Road - Counts 3 and 13 | $554,427 |
| **TOTAL** | **$5,201,329** |

(U.S. Sent. Mem. 35, Dkt. No. 251.) Pursuant to 18 U.S.C. § 3663A(b), the government reduces the total amount to account for property already recovered by the EDA, reducing the total by $1,007,672.00 for the Happy Creek property and $649,388.40 for the EDA's recovery from McDonald's bankruptcy estate. At the initial sentencing hearing, the government further acknowledged that a reduction of $200,000 was proper for EDA's receipt of that amount from DaBoyz, LLC. Allowing for these discounts, the total restitution sought by the government for the EDA is $3,344,268.60.

McDonald objects to three aspects of the proposed restitution: (1) any restitution requested by Truc Tran (PSR ¶ 116): (2) restitution based on payments to McDonald's credit cards for counts other than Counts 4, 5, 6, and 7; and (3) the lack of a restitution discount or offset for $600,000 paid by Vaught to the EDA to resolve a civil claim, or the possibility thereof,

6

for unjust enrichment regarding the Buck Mountain properties.

### 1. Truc Tran's request for restitution (McDonald's Objection #19)

Paragraph 116 of the PSR notes that Truc Tran has been identified as a victim who experienced a financial loss, but that no victim impact statement or request for restitution has been submitted. The United States understands that Tran may be making a request for restitution, but none has been made despite inquiry. McDonald objected to this paragraph because, as her counsel correctly noted at the hearing, a victim is required to submit a restitution request ten days in advance of sentencing. As of the date of the April 9, 2024 hearing and to the date of this opinion, the court is not aware of any such request by Mr. Tran. McDonald also contends that Tran did not suffer any financial loss as a result of the only count in which he was a victim—the aggravated identity theft in Count 18.

The court overrules any objection to the text of paragraph 116, which is accurate in that Tran may believe he suffered a financial loss. Of course, if no timely request for restitution is made and no proof thereof provided on behalf of Tran, no restitution will be awarded to him.

### 2. Payments from EDA accounts to McDonald's credit card accounts for counts other than Counts 4, 5, 6, and 7

In the first row of the chart calculating restitution, the United States lists an amount of $872,230 for payments to McDonald's credit cards in reference to Counts 4, 5, 6, and 7 and "additional executions of scheme."[1] McDonald believes that the amount requested improperly includes monies that were paid from EDA accounts to her personal credit card accounts relating to the bank fraud counts found in Counts 14 through 17. She argues that this is improper

---

[1] Trial Exhibit 184A shows that this is the total amount taken from EDA accounts and paid directly to credit cards in the name of McDonald or her husband. The specific transactions for each credit card are reflected in exhibits 184A through 184E and reflect the following amounts paid from EDA accounts: $13,681.46 to the Bank of America card in the name of Samuel North; $646,540.87 to one of McDonald's two Bank of America cards; $153,914.00 to McDonald's second Bank of America card; $14,250.00 to McDonald's Chase card; $43,365.52 to McDonald's Sears card; and $478.26 to McDonald's Lowes card.

because, post-trial, the court granted acquittal on those four counts. By McDonald's calculation, the only credit card amounts for which she owes restitution total $56,915.49 (Count 4 - $13,562.31; Count 5 - $17,563.98; Count 6 - $19,250; Count 7 - $6,539.20).

The Mandatory Victim Restitution Act provides restitution to those "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered" and "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern" if an offense "involves as an element a scheme, conspiracy, or pattern of criminal activity." *United States v. Davenport*, 445 F.3d 366, 373 (4th Cir. 2006), *abrogated on other grounds by Iziaarry v. United States*, 553, U.S. 708 (2008) (quoting 18 U.S.C. § 3663A(a)(2)). Moreover, as the government notes, "a sentencing court may order restitution for losses resulting from a scheme even if the defendant is not convicted of each individual criminal act, e.g., indictment count, as long as the acts are the direct result of the defendant's criminal conduct or are 'closely related to the scheme.'" *United States v. Lomas*, 392 F. App'x 122, 128 (4th Cir. 2010) (quoting *United States v. Karam*, 201 F.3d 320, 325–26 (4th Cir. 2000)).

Relevant here, McDonald was convicted of seven counts of wire fraud, an element of which is that defendant knowingly devised a scheme or artifice to defraud or to obtain money by materially false or fraudulent pretenses, representations, or promises. She was also convicted of six counts of bank fraud, an element of which is that defendant knowingly executed a scheme to obtain any of the moneys, funds, credits, assets, or other property owned by or under the control of a financial institution, buy means of materially false or fraudulent pretenses, representations, or promises. Additionally, McDonald was convicted of sixteen counts of money laundering.

McDonald argues that because she was acquitted of four of the counts of bank fraud, she is not accountable in restitution for using the EDA's monies to pay her personal credit card

8

accounts. In other words, she was found guilty of the wire fraud in which she was able to obtain the money from an EDA line of credit and have it placed in an EDA account—the first part of the scheme. Then, she accessed that money in the EDA account, using her signing authority, by writing checks (or having others write checks) to pay her personal credit card bills—the second part of the scheme, where she derived the benefit and spent the money on personal expenses. As to the second part of the scheme, as the court found, this money was not procured from the bank "by means of" fraud because none of the misrepresentations to the bank was "the natural mechanism naturally inducing" the bank to honor the checks. McDonald asserts that without a conviction for embezzlement or misuse of public funds, no restitution is available for the second part of the scheme.

McDonald's argument is contrary to established authority as to restitution amounts that must be awarded where the defendant has been convicted of offenses involving schemes. Specifically, the Mandatory Victim Restitution Act identifies a "victim" as

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme conspiracy or pattern . . . .

18 U.S.C. § 3663A(a)(2).

Here, the EDA clearly is a victim of McDonald's offenses that have as an element a "scheme." And the harm it suffered as a result of her using money in the EDA account to pay her personal credit card bills is a loss resulting from the scheme and the direct result of her criminal conduct and also is "closely related" to the scheme. *Karam*, 201 F.3d at 326. Indeed, the court finds it noteworthy that—just as in *Lomas*, where the Fourth Circuit affirmed a higher amount of restitution than the amount involved in the count of conviction—the indictment here describes McDonald's scheme in its introduction and those factual allegations are incorporated

into many of the counts of which she was convicted. *See Lomas*, 392 F. App'x at 125.

For these reasons, the court will include in the restitution amount the total amounts taken from the EDA accounts and used to pay McDonald's (and her husband's) credit cards.

### 3. Money the EDA obtained from Vaught

The parties agree that one or more of the original owners of the Buck Mountain properties, hereinafter Vaught, paid $600,000 to the EDA to resolve a claim, or potential claim, for unjust enrichment. Specifically, as explained in the PSR, after McDonald took $2 million of the EDA's money, she bought the Buck Mountain properties in the name of her LLC from Vaught for $1.9 million. A little over one month later, she sold the property back to Vaught for $1.3 million. Thus, Vaught netted $600,000 in the process of these transactions.

In McDonald's view, the restitution amount should be discounted by $600,000 recovered by the EDA. The government disagrees, arguing that the Mandatory Victim Restitution Act provides that "[i]n no case shall the fact that a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source be considered in determining the amount of restitution." 18 U.S.C. § 3664(f)(1)(B). The statute goes on to provide that "[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in – (A) any Federal civil proceeding; and any State civil proceeding, to the extent provided by the law of the State." 18 U.S.C. § 3664(j)(2). Thus, the statute contemplates avoiding a windfall to a victim and a procedure by which the restitution amount is later reduced.

To avoid judicial inefficiency and to avoid the risk of a double recovery, the court will reduce the restitution amount by the $600,000 paid to the EDA by Vaught. Another district court, albeit not within the Fourth Circuit, found this to be an efficient way to resolve a restitution issue in a wire fraud and conspiracy case where victims had already recovered monies

from third parties in civil settlements.  *United States v. Jesenik*, No. 3:20-cr-228-SI, 2023 WL 8016732, at *9 (D. Ore. Nov. 20, 2023).  This court will do the same.

## II.  CONCLUSION AND ORDER

For the reasons described, the court issues the rulings as set forth above on the remaining objections to the PSR and as to restitution.

Entered: May 24 , 2024.

*/s/ Elizabeth K. Dillon*

Elizabeth K. Dillon
United States District Judge